CARLIE CHRISTENSEN, United States Attorney (#0633)
JARED C. BENNETT, Assistant United States Attorney (#9097)
LAKE DISHMAN, Assistant United States Attorney (Provisionally admitted; Licensed in VA)
185 South State Street, #300
Salt Lake City, Utah 84111
Telephone:   (801) 524-5682
jared.bennett@usdoj.gov
Attorneys for the United States of America

─────────────────────────────────────────────────────────

IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
CENTRAL DIVISION

─────────────────────────────────────────────────────────

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:14CR470RJS-BCW |
| Plaintiff, | **MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS MISDEMEANOR INFORMATION** |
| vs. | |
| PHILLIP KAY LYMAN; MONTE JEROME WELLS; SHANE MORRIS, MARIAN; and FRANKLIN TRENT HOLLIDAY; | Honorable Robert J. Shelby Magistrate Judge Brooke C. Wells |
| Defendants. | |

─────────────────────────────────────────────────────────

The United States opposes Mr. Lyman's "Motion to Dismiss Misdemeanor Information."

ECF No. 78.   As shown below, this Court should deny Mr. Lyman's motion because: (1) the First

Amendment neither confers upon Mr. Lyman a right to commit crime nor a "right not to be tried"

for his crimes; (2) the Superseding Misdemeanor Information adequately pleads a conspiracy; and

(3) Recapture Canyon was closed to unauthorized motor vehicle use on May 10, 2014, when Mr.

Lyman led a group of motorized riders into the closed area.   Therefore, this court should deny Mr.

Lyman's motion.

**REGULATORY BACKGROUND**

In 1972, President Richard M. Nixon signed Executive Order 11,644, which dealt

specifically with the effects that recreational off-road vehicles were having on federal public land.

This Executive Order found that:

> An estimated 5 million off-road recreational vehicles . . . are in use in the
> United States today, and their popularity continues to increase rapidly.  The
> widespread use of such vehicles on the public lands—often for legitimate purposes
> but also in frequent conflict with wise land and resource management practices,
> environmental values, and other types of recreational activity—has demonstrated
> the need for a unified Federal policy toward the use of such vehicles on public
> lands.

37 Fed. Reg. 2,877 (Feb. 9, 1972).   Given these findings, President Nixon's Executive Order

required the Secretary of the Interior to "develop and issue regulations and administrative

instructions . . . to provide for administrative designation of the specific areas and trails on public

lands on which the use of off-road vehicles may be permitted, and areas in which the use of

off-road vehicles may not be permitted . . . ." *Id.*   Also, President Nixon required the Secretary of

the Interior to "prescribe appropriate penalties for violation of regulations adopted pursuant to this

order," and to "establish procedures for the enforcement of those regulations." *Id.* at 2,878.

In 1976, Congress exercised its plenary authority over public land pursuant to Article IV of

the United States Constitution by enacting the Federal Land Policy and Management Act

("FLPMA"), 43 U.S.C. §§ 1701 to 1787.[1]   FLPMA requires the Bureau of Land Management

---

[1]  Article IV of the United States Constitution vests in Congress the "[p]ower to dispose of and
make all needful Rules and Regulations respecting . . . Property belonging to the United States."
Art. IV, § 3, cl. 2.   "The power over the public lands thus entrusted to Congress [under Article IV]
is <u>without limitations</u>." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (citations and
quotations omitted, emphasis added).

("BLM") to manage federal public land under principles of "multiple use and sustained yield." 43 U.S.C. § 1732(a).   To help achieve this, FLPMA requires BLM to prepare land-use plans detailing the allowed uses on the public lands covered by the plan.   43 U.S.C. § 1712(a). Although FLPMA requires land-use planning, it also provides an independent duty that "the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent the unnecessary and undue degradation" of public lands.   43 U.S.C. § 1732(b) (emphasis added).

Seven months after the enactment of FLPMA, President James E. Carter issued Executive Order 11,989, which amended President Nixon's Executive Order regarding off-road vehicles on public lands.   42 Fed. Reg. 26,959 (May 25, 1977).   Specifically, President Carter's Executive Order authorized the Secretary of the Interior to "immediately close" areas of public lands "whenever" the Secretary "determines that the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife habitat or cultural or historic resources . . . ."   *Id.*   President Carter's Executive Order further authorized the Secretary to keep such trails closed "until such time as he determines that such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence."   *Id.*

With the authority granted to the Secretary of the Interior under FLPMA and Executive Orders 11,644 and 11,989, BLM engaged in several years of rulemaking under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and ultimately promulgated regulations governing the closure of trails on public lands to recreational off-road vehicles.   44 Fed. Reg. 34,834 (June 15, 1979) codified as 43 C.F.R. part 8340.   Following the language in President Carter's Executive Order, 43 C.F.R. § 8341.2(a) allows the authorized officer at BLM to "immediately close" areas of

3

public land when he/she "determines that off-road vehicles are causing or will cause considerable

adverse effects on the soil, vegetation, wildlife habitat or cultural or historic resources . . . until the

adverse effects are eliminated and measures implemented to prevent recurrence."   Prior to

determining to close an area to off-road vehicles, BLM need not comply with the land-use

planning requirements of FLPMA or with its accompanying analysis under the National

Environmental Policy Act ("NEPA").   *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125,

1135-36 (10th Cir. 2006).

### FACTUAL BACKGROUND

On September 13, 2007, under the authority of 43 C.F.R. § 8341.2(a), BLM closed

Recapture Canyon to recreational motorized use because the authorized officer in BLM's

Blanding Field Office determined that off-road vehicle use had caused "damage to the cultural

resources in Recapture Canyon . . . ."   ECF No. 78-1 at 2 of 15.   Instead of prescribing a specific

expiration date, the authorized officer ordered the closure "until the considerable adverse effects

leading to the closure have been eliminated and measures have been implemented to prevent

recurrence."   ECF No. 78-1 at 2 of 15.   BLM published the notice of closure in the *Federal

Register.*   Notice of Closure of Public Lands to Off-Highway Vechicle (OHV) Use, 72 Fed. Reg.

57,067 (Oct. 5, 2007).

More than two years after publication of the closure order, BLM issued Instruction

Memorandum No. 2010-028 ("the IM").[2]   ECF No. 78-1 at 5 of 15.   The purpose of the IM was

---

[2]  The IM is "general statement of policy" without the force and effect of law and, thus, is not
subject to the APA's rulemaking requirements.   5 U.S.C. § 553(b)(3)(A); *see generally Perez v.
Mortg. Bankers Ass'n*, 575 U.S. ___, 2015 WL 998535 **3-4 (March 9, 2015).

to clarify "policy and procedures related to processing, reviewing, and implementing temporary closures" on public lands.   ECF No. 78-1 at 5 of 15.   Among other things, the IM provided that temporary closures "must be 24 months or less in duration," but the IM also allowed extending closures for additional time if BLM completed the appropriate NEPA and FLPMA analyses. ECF No. 78-1 at 6 of 15.

On June 6, 2011, BLM amended the IM.   Exhibit A ("the amended IM").   The amended IM clarified that "[t]he 24-month limitation applies to the issuance of new temporary closures, and does not affect closures or restrictions that are already in effect."   Exhibit A at 2.

On May 10, 2014, Mr. Lyman led dozens of people that he had organized in the preceding weeks in a motorized ride up Recapture Canyon in protest of BLM's land management policies. ECF No. 78 at 3.   On December 5, 2015, the United States filed the Superseding Misdemeanor Information against Mr. Lyman, among others, charging him with: (1) conspiracy to operate off-road vehicles on BLM public land that was closed to such vehicles; and (2) operating off-road vehicles through Recapture Canyon in violation of BLM's closure order.   ECF No. 41.

On March 10, 2015, Mr. Lyman filed his motion to dismiss based on three grounds.   ECF No. 78.   First, he contends that this entire action should be dismissed because he "has a constitutionally protected right to free speech in his reporting of the news."   ECF No. 78 at 4. Second, he argues that the conspiracy count should be dismissed because the Superseding Misdemeanor Information does not allege the element of interdependence.   ECF No. 78 at 5. Finally, Mr. Lyman alleges that he could not have committed the crime of illegally riding in a closed area through Recapture Canyon because BLM's 2007 closure order expired pursuant to the

terms of the 2009 IM.   Consequently, he argues, Recapture Canyon was open to recreational

vehicles on May 10, 2014.   ECF No. 78 at 6-7.   Thus, he contends, the Superseding

Misdemeanor Indictment should be dismissed against him.

As shown definitively below, Mr. Lyman is wrong.   First, Mr. Lyman's right to free

speech neither provides him with a right to commit a crime nor a right not to be tried.   Second,

the Superseding Misdemeanor Information adequately pleads the "interdependence" element of

conspiracy.   Finally, BLM's 2007 order closing Recapture Canyon was still in effect on May 10,

2014.   Each argument is addressed in order below.

ARGUMENT

## I.   THE FIRST AMENDMENT DOES NOT PROVIDE THOSE WHO REPORT THE NEWS WITH A RIGHT TO COMMIT CRIME OR A RIGHT NOT TO BE TRIED.

This Court should deny Mr. Lyman's Motion to Dismiss because he cannot show that the

First Amendment grants him a right to commit a crime or a right not to be tried for it.   "Supreme

Court precedent makes it pellucid that the principle of freedom of the press does not support the

edifice that Defendants here attempt to construct: freedom of the press to violate the law." *United

States v. Maldonado-Norat*, 122 F.Supp.2d 264, 265 (D. P.R. 2000).   Consequently, although Mr.

Lyman has a right under the First Amendment to report the news, he does not have a right to

violate the law.   For this reason, the First Amendment does not provide a defendant with a right

not to be tried for a crime committed in the course of allegedly reporting the news except in very

narrow circumstances. *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 267 (1982) (per

curiam); *United States v. Quaintance*, 523 F.3d 1144, 1146 (10th Cir. 2008) (quoting *Digital

Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994)) (stating that both the Tenth Circuit

6

and the United States Supreme Court, "'view claims of "a right not to be tried" with skepticism, if not with a jaundiced eye'").

Not surprisingly, establishing the First Amendment's "right not to be tried" is very difficult.   For example, in *United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992), the court stated that to establish this right, a defendant must show that "there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred <u>but for</u> the hostility or punitive animus towards the defendant because he exercised his specific legal rights." *Id.* at 860 (emphasis in original, citations and quotations omitted).

The heft of the burden to establish a "right not to be tried" is substantial because a less-burdensome rule would improperly deprive the jury of its right to determine the facts and the intent of those charged.   By illustration, in *United States v. White*, the defendant was charged with soliciting a crime of violence because he: (1) posted on his website the contact information of a juror who participated in convicting the defendant's white supremacist colleague and (2) urged others on his website to take violent action against the juror.   610 F.3d 956, 957-58 (7th Cir. 2010).   Before trial, the defendant moved to dismiss the indictment claiming that his speech was protected under the First Amendment.   *Id.* at 958.   The district court agreed and dismissed the charge against him.   *Id.*

However, the Court of Appeals for the Seventh Circuit reversed the dismissal.   The Seventh Circuit reasoned that the jury's function was to determine whether the allegedly protected speech fell within the ambit of the First Amendment and whether the defendant had the requisite intent to commit the crime of solicitation.   *Id.* at 960.   The court stated:   "[S]peech 'brigaded

with action' becomes an overt act or conduct that can be regulated.   For this reason, a state cannot forbid individuals from burning crosses to express an opinion, but it can forbid individuals from burning crosses with the intent to intimidate others."   *Id*.   Therefore, the jury, not the court, must decide whether the defendant's alleged "free speech" was laced with sufficient intent to commit a crime, which removes it from any protections afforded under the First Amendment.

Consequently, instead of barring trial in the name of the First Amendment, the Tenth Circuit's preferred approach is to allow the jury to decide the validity of First Amendment defenses.   *Quaintance*, 523 F.3d at 1146; *United States v. Ambort*, 193 F.3d 1169, 1171 (10th Cir. 1999) (holding that "a right not to be tried" did not exist under the First Amendment for defendants charged with conspiracy for violating tax laws).   Allowing the jury to decide protects its central function as the fact-finder and does not unduly prejudice the defendant because "First Amendment defenses . . . are adequately safeguarded by review after any adverse final judgment." *Quaintance*, 523 F.3d at 1146.

In light of these principles, Mr. Lyman's motion to dismiss fails to carry the heavy burden to invoke the First Amendment's "right not to be tried" and shows how the jury will be improperly deprived of its central function if a "right not to be tried" under the First Amendment is recognized here.   Even assuming that the factual allegations in his motion are true, they are woefully insufficient to carry his burden to establish a right not to be tried.   Mr. Lyman's motion fails to make any allegation of Federal Government animus or hostility toward his online speech much less a level sufficient to show "a reasonable likelihood" that the prosecution was motivated by that hostility.   Consequently, this Court should deny Mr. Lyman's motion.

8

Moreover, Mr. Lyman's motion underscores the need to follow the Tenth Circuit's preferred approach to let the jury decide the validity of First Amendment defenses at trial.   For example, the jury must be able to decide as a factual matter whether Mr. Lyman was really "reporting . . . the news" or whether his use of the internet was an overt act that furthered an illegal agreement to violate federal law.   ECF No. 78 at 4.   The role of the jury in making this determination is especially crucial here because lawful acts can constitute overt acts if they furthered the conspiracy.   *Iannelli v. United States*, 420 U.S. 770, 786 n.17 (1975) ("[The overt act] can be innocent in nature, provided it furthers the purpose of the conspiracy.").   Thus, as in *White*, the jury in this action must decide whether Mr. Lyman's statements were protected speech under the First Amendment or whether his statements, even if lawful, were made with the requisite intent to participate in a conspiracy to violate federal law.   Deciding these fact-laden issues in a motion to dismiss would improperly intrude upon the purview of the jury, which is precisely what the Tenth Circuit sought to preclude by making the right-not-to-be-tried standard so heavy. Because the First Amendment neither provides Mr. Lyman with a right to break the law in the name of free speech nor a right not to be tried when he does break the law, his first argument fails.

## II.   THE SUPERSEDING MISDEMEANOR INDICTMENT ADEQUATELY PLEADS THE CONSPIRACY CHARGE.

The conspiracy count is adequately pled in the Superseding Misdemeanor Information. Mr. Lyman contends that the Superseding Misdemeanor Information inadequately pleads conspiracy by failing to allege the element of "interdependence."   ECF No. 78 at 5-6. "Interdependence exists when each alleged coconspirator's activities 'constituted essential and integral steps toward the realization of a common, illicit goal.'"   *United States v. Hanzlicek*, 187

9

F.3d 1228, 1232 (10th Cir. 1999).   Where, as here, a charging document does not specifically use the word "interdependent" when describing a conspiracy, courts look to the behavior described in the charging document to determine whether interdependence has been adequately pled.   *United States v. Bedford*, 536 F.3d 1148, 1157 (10th Cir. 2008) ("Finally, while not using the label interdependent, the indictment described the interdependent behavior of the coconspirators in the sections entitled 'Manner and Means of the Conspiracy' and 'Over Acts.'   Thus, the indictment sufficiently charged Defendant with elements of conspiracy.").

The behavior of the coconspirators described in the Superseding Misdemeanor Information more than adequately alleges interdependence.   Allegations 1-2 of the Superseding Misdemeanor Information provide that the coconspirators' illicit goal was to operate off-road vehicles through Recapture Canyon, which was closed to recreational off-road vehicle use.   Allegations 3 through 13—which are in the "Manner and Means of the Conspiracy" and "Overt Acts" sections—detail each coconspirator's contribution to the conspiracy in preparation for the ride and in engaging in the protest ride itself.   These allegations show that Mr. Lyman organized the illegal ride, publicized it, and relied on Mr. Wells to also publicize it and to invite others to join.   Additionally, the allegations show that all four of the coconspirators engaged in the overt act of unlawfully driving their recreational off-road vehicles through Recapture Canyon to protest BLM's land-management policies.   Thus, the coconspirators' behavior described in the Superseding Misdemeanor Information sufficiently alleges what each did to contribute to the illicit goal of riding recreational off-road vehicles through a closed area.   Accordingly, the element of interdependence and the crime of conspiracy are adequately pled.

**III.    RECAPTURE CANYON WAS OBVIOUSLY CLOSED ON MAY 10, 2014 WHEN MR. LYMAN AND HIS COCONSPIRATORS ENGAGED IN THEIR ILLEGAL RIDE UP RECAPTURE CANYON.**

Mr. Lyman argues that, under the IM, BLM could only close Recapture Canyon to recreational off-road vehicles for two years <u>unless</u> BLM engaged in FLPMA land-use planning and its accompanying NEPA analyses to extend the closure for a longer period of time.   ECF No. 78 at 7-8.   Because BLM did not extend the 2007 closure order by engaging FLPMA land-use planning and NEPA analysis, Mr. Lyman contends that the IM required the 2007 closure order to expire on September 13, 2009.   ECF No. 78 at 7-8.   Thus, according to Mr. Lyman, Recapture Canyon was open to recreational off-road vehicles on May 10, 2014, which means that he could not have committed the crime with which he is charged.

Mr. Lyman is wrong for two reasons.   First, the IM did not exist until more than two years <u>after</u> BLM closed Recapture Canyon.   Thus, the only way Mr. Lyman could show that the 2009 IM applied to BLM's 2007 closure of Recapture Canyon is to show that the IM had a retroactive effect.   Mr. Lyman cannot so prove because the IM was amended in 2011 to clarify that it applied only to closures made <u>after</u> the IM was issued.   Exhibit A.   Thus, by its own terms, the IM had no retroactive effect on existing closures.

Moreover, even if BLM had wanted to change the duration of a closure order issued under 43 C.F.R. § 8341.2(a) to two years, it could not have done so by issuing the IM.   BLM promulgated 43 C.F.R. § 8341.2 under the APA's notice-and-comment rulemaking provisions. 44 Fed. Reg. 34,834 (June 15, 1979) codified as 43 C.F.R. part 8340.   Therefore, section 8341.2 has the force and effect of law.   5 U.S.C. § 553; *Perez*, 575 U.S. ___, 2015 WL 998535 *3 ("Rules

issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'").   Instead of requiring BLM to close an area for a specific time period, 43 C.F.R. §8341.2(a) requires the area to remain closed "until the adverse effects are eliminated and measures implemented to prevent their recurrence."   Unlike section 8341.2, the IM was not subject to the APA's rulemaking provisions and, therefore, does not have the force and effect of law.   *Perez*, 575 U.S. ___, 2015 WL 998535 *4 (stating that interpretive rules '"do not have the force and effect of law and are not accorded that weight in the adjudicatory process'" (citations omitted)).   Because the IM lacks the force and effect of law, it cannot amend 43 C.F.R. § 8341.2 to automatically lift a closure after a two-year period has expired.   Thus, even if BLM had wanted to change the duration of a closure order issued under section 8341.2(a) to two years, it could only do so through APA notice-and-comment rulemaking; not by issuing a policy statement in the IM.   Accordingly, by its own terms or as a matter of law, the IM could have no effect on the duration of BLM's 2007 closure order, which was still in effect when Mr. Lyman and his coconspirators violated it on May 10, 2014.[3]

Second—and equally detrimental to Mr. Lyman's argument—is the fact that the Tenth Circuit has already held as a matter of law that BLM is not required to engage in FLPMA's land-use planning requirements and its accompany NEPA analyses to issue a temporary closure order under 43 C.F.R. § 8341.2(a).   *Utah Shared Access Alliance*, 463 F.3d at 1136.   In *Utah Shared Access Alliance*, BLM issued orders closing and restricting areas on public land to

---

[3]  Ironically, even if the IM qualified as a rule with the force and effect of law under the APA, it still would not apply retroactively.   *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (affirming that "the APA, as a general matter, forbids retroactive rulemaking"). Therefore, the 2007 closure order was in effect on May 10, 2014.

recreational off-road vehicles.   *Id.* at 1132.   Like BLM's closure order in Recapture Canyon, one of BLM's closure orders in *Utah Shared Access Alliance* provided that "[t]his limitation will remain in effect until the considerable adverse effects giving rise to this limitation are eliminated and measures are implemented to prevent recurrence of these adverse effects."   *Id.* at 1133 (citations and quotations omitted).   The plaintiffs challenged BLM's closure and restriction orders arguing, among other things, that BLM had an obligation to engage in FLPMA and NEPA analyses before issuing the temporary closures.   *Id.* at 1135.

The Tenth Circuit expressly rejected this argument.   *Id.* at 1135, 1136.   The court reasoned that closing areas to off-road-vehicle use does not require FLPMA land-use planning and its accompanying NEPA analyses because such a lengthy process would significantly impair BLM's statutory obligation under FLPMA "to 'take any action necessary to prevent unnecessary and undue degradation of public lands.'"   *Id.* at 1136 (quoting 43 U.S.C. § 1732(b)).   Indeed, requiring a lengthy analytical process would directly conflict with the closure regulations promulgated under FLPMA, which state that BLM "'<u>shall immediately close</u> the areas affected by the types of vehicles causing the adverse effect . . . .'"   *Id.* at 1130 (emphasis in original, quoting 43 C.F.R. § 8341.2(a)).   Consequently, in the Tenth Circuit, BLM does not need to engage in FLPMA land-use planning and its accompanying NEPA analyses when issuing a closure order under 43 C.F.R. § 8341.2(a).   Thus, Mr. Lyman has no legal basis to contend that Recapture Canyon was open on May 10, 2014, and his third argument must be rejected.

## CONCLUSION

As stated above, this Court should deny Mr. Lyman's Motion to Dismiss because: (1) the

13

First Amendment neither affords him a right to commit crimes nor a right to not to be tried for them; (2) the Superseding Misdemeanor Information adequately pleads the element of "interdependence" in the conspiracy charge; and (3) the area through which Mr. Lyman led his group of recreational off-road vehicles on May 10, 2014 was closed.

      DATED this 20th day of March 2015.

CARLIE CHRISTENSEN
United States Attorney

/s/ Jared C. Bennett
JARED C. BENNETT
Assistant United States Attorney

14